# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

v.

Travis Malik Galtney,

          Defendant.

Crim. No. 19-332 (MJD/BRT)

**REPORT AND RECOMMENDATION**

Chelsea A. Walcker, Esq., Benjamin Bejar, Esq., United States Attorney's Office, counsel for Plaintiff.

Jordan S. Kushner, Esq., CJA, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

On May 17, 2022, Defendant Travis Malik Galtney was indicted via a Superseding Indictment on an additional count of being a felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 69, Superseding Indictment.) This case is before the Court on Defendant's motions to suppress evidence and statements related his additional count from the Superseding Indictment. (Doc. Nos. 83, 84.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. This Court held a motion hearing on July 21, 2022, and received five exhibits into evidence as well as testimony from Sergeants Jason Hughes and Tim Moore. (*See* Doc. Nos. 99, 100, 107.) For the reasons stated below, this Court recommends that Defendant's motions be denied.

I.  **FACTS**

  **A. Traffic Stop**

On December 18, 2019, a grand jury returned an Indictment charging Defendant with being a felon in possession of a firearm. (Doc. No. 1.) The same day, the Court issued an arrest warrant for Defendant. (*See* Doc. No. 2; Doc. No. 100, Exhibit List for 7/21/22 Hearing, Gov't. Ex. 1.) Several weeks later, a U.S. Marshal Service Fugitive Task Force of approximately six or seven officers was assigned to locate Defendant on the arrest warrant. (Doc. No. 107, 7/21/22 Hrg. Transcript ("Tr.") at 10–13.) Sergeant Jason Hughes was one of the task force members assigned. Pursuant to standard procedure, members of the task force received information about Defendant, including what Defendant was wanted for (felon in possession of a firearm), his vehicle description (a dark-colored Pontiac), his license plate number, and a photo of Defendant. (*Id.* at 12–13, 20, 26.) All the task force members communicated through the same radio channel. (*Id.* at 11.)

On January 8, 2020, while assigned to the task force, Sergeant Hughes and the rest of the task force received broadcasted information via radio from a task force officer that a vehicle believed to be associated with Defendant had been located in Minneapolis near Golden Valley Road and Thomas Avenue North. (*Id.* at 10–13.) After being alerted that Defendant had possibly been located, Sergeant Hughes drove his squad car, along with other task officers, to the area of Golden Valley Road and Thomas Avenue North where a Pontiac vehicle was observed leaving the area with a black male driver and a female

passenger. (*Id.* at 13.) The Pontiac matched the motor vehicle and license plate associated with Defendant. (*Id.* at 40.)

Sergeant Hughes and the other task force officers began to follow the Pontiac for several blocks. (*Id.* at 14.) Even though the officers determined that the driver of the Pontiac matched the description of Defendant, they continued to follow the Pontiac to "make sure" that the driver was Defendant.[1] After following the Pontiac about fifteen minutes, the Pontiac pulled along the curb of a Walmart where it parked in the area of a fire lane. (*Id.* at 15.) Sergeant Hughes pulled into the Walmart parking lot and parked in front of the Pontiac while other task force officers arrived. (*Id.*) Another task officer drove by the Pontiac and relayed via radio to the rest of the task force that the driver was Defendant. (*Id.* at 16, 41.) At that point, Sergeant Hughes was "[o]ver 90 percent" sure

---

[1] At the hearing, Sergeant Hughes testified as follows:

[SERGEANT HUGHES]: . . . we wanted to make sure that we believed it was [Defendant] driving and not, you know, some other male driving the vehicle.

[GOVERNMENT]: And why is that -- information important to you?

[SERGEANT HUGHES]: Well, in my experience, I would never stop a vehicle unless I believed it was a suspect that I was looking for. If I were to stop the vehicle and not know that it was my target, that information would be relayed to my target and then I would lose the element of surprise. We had information that there was a vehicle and we had reason to believe that the subject was driving the vehicle. We just wanted to make sure before we actually did that and got enough officers in the area to safely apprehend him.

(Tr. 14–15.)

3

that the driver of the Pontiac was Defendant. (*Id.* at 16.) The officers then activated their emergency lights, drew their guns, secured the vehicle's occupants, and removed Defendant from the driver's seat. (*Id.* at 18.) According to Sergeant Hughes, once Defendant stepped out of the vehicle, Sergeant Hughes and the task force officers "immediately knew it was 100 percent" Defendant and arrested him. (*Id.* at 19.) A firearm was later found inside the car after a search was conducted pursuant to a search warrant.

### B. Police interview

On the same day as his arrest, Defendant was transported to a U.S. Marshal's cellblock at the St. Paul Courthouse where he was interviewed by Sergeant Tim Moore and Special Agent Kylie Williams. (*Id.* at 43–45.) The interview took place in an interview room inside the cellblock, which was divided in half by a brick wall with a screen barrier so that the officers could see and hear Defendant on the other side but could not touch him. (*Id.* at 46.) Defendant was let into his side of the room through a door and agreed to speak with the officers. (*Id.*)

Before beginning the interview, Sergeant Moore advised Defendant of his *Miranda* rights using the St. Paul Police Department's standard *Miranda* form. (*Id.* at 48, Gov't. Ex. 3.) Because of the screen barrier, Sergeant Moore did not pass the form but walked through it, noting Defendant's oral acknowledgment on the form in the space where an interviewee would typically initial. (Tr. 49–50; Gov't. Ex. 3.) Before proceeding with the interview, Sergeant Moore asked Defendant, "so you understand

your rights?", to which Defendant responded, "Yes." (Gov't. Ex. 4A.)[2] Sergeant Moore made that notation, then he signed the bottom of the form and proceeded to interview Defendant. (Tr. 49–50; Gov't. Ex. 3.)

Defendant spoke with Sergeant Moore and Special Agent Williamson. (Tr. 50.) The interview lasted approximately thirty-five minutes and was recorded. (*Id.* at 46.) At no point during the interview did Defendant request an attorney. (*Id.* at 50.) Sergeant Moore testified that, based on his experience, Defendant did not appear to be under the influence of any alcohol, medication, or narcotics and that Defendant spoke in a normal cadence and did not slur his words. (*Id.* at 51.) Sergeant Moore also testified that Defendant appeared comfortable, made eye contact with him during the interview, was conscious while he spoke, and tracked his questioning. (*Id.* at 51–52.) The tone of the interview was cordial and professional and was a back-and-forth conversation. (*Id.* at 59–60.) At no point during the interview were there any instances of violence, threats, ruses, or promises directed towards Defendant. (*Id.* at 60–61.) Sergeant Moore testified that during the interview Defendant made certain admissions potentially relevant to the firearms charge against him. (*Id.* at 53, 55.)

---

[2] Defendant states in his briefing that, on the recording, after Sergeant Moore asked him if he understood his rights, "there is no audible answer." (Doc. No. 108, Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress Evid. From 1/8/2020 ("Def.'s Mem.") 8.) But this Court has independently reviewed the audio recording and finds that Defendant clearly responded "Yes" when asked by Sergeant Moore whether he understood his rights. (*See* Gov't. Ex. 4A at 3:31–33.)

5

## II.   ANALYSIS

Defendant seeks to suppress evidence seized by the police during their warrantless search of his vehicle on January 8, 2020. (*See generally* Doc. No. 108, Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress Evid. From 1/8/2020 ("Def.'s Mem.").) He argues that the police lacked legal justification for the traffic stop. (*Id.* at 5.) Defendant also seeks to suppress his statements made during the interview with police asserting that police failed to establish a valid *Miranda* waiver. (*Id.* at 7.) The Government opposes both arguments. (*See generally* Doc. No. 118, Gov't's Opp'n to Def.'s Mots. to Suppress ("Gov't.'s Mem.").)

### A.   Traffic Stop

Defendant argues that the officers lacked reasonable suspicion to stop his vehicle. In response, the Government argues that the task officers' observations of a driver matching Defendant's description in a vehicle associated with Defendant provided reasonable suspicion to stop Defendant's vehicle.

When "police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion.'" *United States v. Rush*, 651 F.3d 871, 876 (8th Cir. 2011) (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)); *see also Terry v. Ohio*, 392 U.S. 1, 25–31, (1968)). "A reasonable suspicion is a particularized and objective basis for suspecting the person who is stopped." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (quotations omitted). "In developing this suspicion, officers may rely on information provided by

6

other officers as well as any information known to the team of officers conducting the investigation." *United States v. Johnson*, 31 F.4th 618, 622 (8th Cir. 2022) (quotations omitted). The level of reasonable suspicion necessary to "justify a stop . . . need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Moreover, "the government at a suppression hearing need only demonstrate that a reasonable suspicion existed by a preponderance of the evidence." *United States v. Atlas*, 94 F.3d 447, 451 (8th Cir. 1996). When deciding whether reasonable suspicion sufficient to justify a *Terry* stop exists, the court looks at the totality of the circumstances. *See United States v. Gilliam*, 520 F.3d 844, 846 (8th Cir. 2008).

As noted above, this Court heard testimony from Sergeant Jason Hughes at the July 21, 2022 suppression hearing regarding the January 8, 2020 traffic stop and arrest of Defendant. Other than Sergeant Hughes, no other members of the January 8, 2020 task force gave testimony regarding the traffic stop. Sergeant Hughes' testimony established the following:

- Sergeant Hughes and the rest of the task force assigned to locate Defendant had Defendant's vehicle description along with a license plate number and a photo of Defendant;

- The task force officers kept in constant communication with each other and shared updates as the investigation continued;

- When the task force officers first encountered Defendant's vehicle, they noted that the vehicle and license plate number matched the vehicle description and license plate of Defendant's vehicle. They also confirmed that a black male driver matching Defendant's description was driving the vehicle;

7

- The officers then followed Defendant's vehicle for several blocks to confirm their suspicions; and

- When Defendant stopped in a Walmart parking lot, a task force officer drove by Defendant's vehicle and radioed the rest of the team that the driver was indeed Defendant. At that point, the police conducted the stop and arrested Defendant.

Taken together, the totality of these circumstances shows that Sergeant Hughes and the rest of the task force officers, through their collective knowledge, had a reasonable suspicion, grounded in specific and articulable facts, that the driver of the vehicle was Defendant. *See United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) (noting that when multiple officers are involved in an investigation, they may base their decision to stop a suspect on their collective knowledge as long as there is some degree of communication). Not only did the task officers confirm the vehicle and its license plate number, but they also, twice, confirmed that the driver matched the description of Defendant. *See, e.g.*, *United States v. Andrews*, 381 F. Supp. 3d 1044, 1063 (D. Minn. 2019) (noting that an officer had reason to believe the suspect was inside the vehicle when he observed a person enter the vehicle who matched a photo of the suspect); *see also United States v. Allison*, 637 F. Supp. 2d 657, 664 (S.D. Iowa 2009) (holding that officers had a valid reason to stop a taxicab when a motel desk clerk had observed a woman matching the description of a suspect leave the hotel in a taxicab); *United States v. Woitaszewski*, No. 8:20CR308, 2022 WL 447229, at *5 (D. Neb. Jan. 6, 2022) (holding that officers had reasonable suspicion to stop a vehicle where they were only provided with a description of the truck the defendant would be inside and a photograph of the defendant), *report and recommendation adopted*, 2022 WL 447211 (D. Neb. Feb. 14,

2022). The task force officers also kept in constant communication with each other, sharing their observations via radio as the investigation continued. *See Frasher*, 632 F.3d at 453 (requiring some degree of communication between officers to establish a collective knowledge). These facts demonstrate that Sergeant Hughes and the rest of the task force officers, through their collective knowledge, had a reasonable suspicion to justify the stop of Defendant's vehicle.

Defendant argues that the Government failed at the July 21, 2022 suppression hearing to meet its evidentiary burden to establish reasonable suspicion. For example, Defendant argues that because Sergeant Hughes recalled during the suppression hearing that Defendant was 5'11"—when in fact his police report[3] said Defendant was 5'4"—Sergeant Hughes' testimony is unreliable as well as "any possible observations supporting an identification of [Defendant]." (Def.'s Mem. 6.) But whether or not Sergeant Hughes accurately recollected Defendant's height at the hearing does not change the totality of circumstances present on January 8, 2020. Those circumstances, as noted above, reflect that the task officers had matched the suspected vehicle and driver with the description of Defendant's car and Defendant's physical description. This was

---

[3]   At the hearing, Defense counsel refreshed Sergeant Hughes recollection by showing him a copy of his police report regarding the January 8, 2020 arrest of Defendant. (Tr. 23–24.) The police report, however, was not submitted as an exhibit, and thus this Court has not reviewed its contents.

9

sufficient to establish reasonable suspicion, regardless of the height Sergeant Hughes recalled at the hearing.[4]

Defendant also argues that the Government failed to meet its burden at the hearing by not providing additional evidence about *how* the other task officers who identified Defendant made their identification. (Def.'s Mem. 6.) In other words, Defendant argues that, because the other task force officers who confirmed the identification of Defendant did not testify at the hearing, the Court "was not provided with any specific evidence, much less reliable evidence, as to the source or basis for" how Defendant was identified. (Doc. No. 119, Def.'s Reply 5.) The Government, however, presented evidence at the hearing that the task force officers were provided a photo of Defendant such that they could make a visual match of Defendant. (Tr. 12–13, 20, 26, 39.) Additionally, officers such as Sergeant Hughes "may rely on information provided by other officers" in making a *Terry* stop, *United States v. Allen*, 705 F.3d 367, 370 (8th Cir. 2013), regardless of whether those officers explain how they came to acquire that information. *See United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) ("We have never required that all the relevant collective knowledge of the team be communicated to the officer who made the stop, the arrest, or the search at issue."); *see also United States v. Williams*, 429 F.3d 767, 771–72 (8th Cir. 2005) (holding in the alternative that the collective knowledge

---

[4]  Moreover, because Sergeant Hughes did not make the visual confirmation of Defendant the day of Defendant's apprehension, his recollection of Defendant's height is irrelevant to his reliance on other task officers who were able to positively identify Defendant. Thus, Sergeant Hughes' misrecollection at the hearing does not alter the reliability of his testimony as it relates to the totality of circumstances present on January 8, 2020.

doctrine was sufficient to impute knowledge to an officer who received a radio request from the DEA, without additional explanation, to stop a vehicle because there might be controlled substances in the vehicle). Thus, through the testimonial evidence of Sergeant Hughes, the Government met its burden to demonstrate that a reasonable suspicion existed by a preponderance of the evidence.[5]

Because the officers had a reasonable suspicion through their collective knowledge, they lawfully performed a traffic stop of Defendant's vehicle. Therefore, because this Court finds that, based on the totality of the circumstances, the task force officers had reasonable suspicion to stop Defendant's vehicle, this Court recommends that Defendant's motion to suppress evidence following the January 8, 2020 stop should be denied.[6]

---

[5]  To the extent that Defendant complains that the task officers who made the identification were not present at the hearing and did not testify about how they made their identification, the district court may rely on hearsay evidence at a suppression hearing so long as the "court is satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness." *United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986). Defendant has not raised any serious doubts about the truthfulness of the other officers' identification, and this Court is satisfied that they were made. Therefore, this Court finds the statements may be relied on in concluding whether reasonable suspicion existed such that the officers lawfully stopped Defendant's vehicle. *See United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) (holding that, even though a detective who testified regarding the traffic stop did not see the traffic violation that allowed the officers to stop the vehicle, "the trial court did not err in relying on hearsay testimony as to the traffic violation that led to the traffic stop").

[6]  This Court notes that Defendant only challenges the traffic stop and not the later search of Defendant's vehicle on January 9, 2020, pursuant to a search warrant.

## B. Police interview

Defendant argues that the Government failed to establish he validly waived his *Miranda* rights. A valid *Miranda* waiver has two distinct dimensions: (1) it "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception" and (2) the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The Government has the burden of proving, by a preponderance of the evidence, that Defendant made a valid waiver of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 473 (1966). To conclude that Defendant's *Miranda* waiver was knowing and intelligent, the Court must find, based on the totality of the circumstances, that he had full awareness of the rights he was waiving, and the consequences of doing so. *Moran*, 475 U.S. at 421.

Here, though Defendant was read his *Miranda* rights, he was not expressly asked by the officers whether he wished to waive those rights. That said, in the absence of an express statement of waiver, "courts can infer a waiver of *Miranda* rights 'from the actions and words of the person interrogated.'" *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *see also United States v. House*, 939 F.2d 659, 663 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."). Moreover, "[t]he Constitution . . . does not require that officers use a waiver form, or obtain an affirmative answer to a question such as, 'Do you waive

these rights.'" *United States v. Pearson*, No. 15-CR-117 (JRT/TNL), 2015 WL 6445439, at *13 (D. Minn. Oct. 23, 2015) (citations omitted).

For example, in *Berghuis*, where the defendant did not sign a waiver form but acknowledged he understood his *Miranda* rights, the Supreme Court held that "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 560 U.S. at 388. Similarly, in *United States v. Reynolds*, the court found that a defendant had implicitly waived his *Miranda* rights when, after being orally read his *Miranda* rights and asked if he wanted to tell "his side of the story," the defendant continued conversing with the police. *See United States v. Reynolds*, No. CR 09-18(1) (RHK/RLE), 2009 WL 776707, at *6 (D. Minn. Mar. 20, 2009) ("Here, [the special agent's] testimony establishes that the Defendant was apprised of his *Miranda* rights prior to the interview, and he chose to waive those rights by providing a statement to the officers.")

Here, this Court has heard and received the testimony provided at the hearing, and independently reviewed the audio of Defendant's recorded interview. Like in *Berghuis* and *Reynolds*, Defendant, after being advised of his *Miranda* rights, acknowledged that he understood them. Defendant then responded to the officers throughout the interview, showing a willingness to answer their questions after he had already acknowledged that he understood his *Miranda* rights. *See Berghuis*, 560 U.S. at 388; *see also United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) ("A suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and then

13

subsequently is willing to answer questions."); *United States v. Adams*, 583 F.3d 457, 468 (6th Cir. 2009) (holding that where the defendant began talking with officers after orally acknowledging he understood his *Miranda* rights, the defendant impliedly waived his *Miranda* rights). Defendant's willingness to answer questions after acknowledging he understood his *Miranda* rights is sufficient to establish that Defendant impliedly waived his *Miranda* rights. *See, e.g., United States v. Soto*, No. 07–CR–0223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) ("[A] defendant's willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."); *United States v. Mandujano*, No. 03–CR–178(2) (JRT/FLN), 2003 WL 22076577, at *4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging *Miranda* rights is sufficient to constitute an implied waiver.").

Additionally, the record reflects that the tone of the interview was cordial and professional and that Defendant affirmatively responded when asked if he understood his rights. *See United States v. Mims*, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding *Miranda* waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone). At no point did the officers interviewing Defendant coerce Defendant, either by violence, threats, ruses, or promises. *See United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). As mentioned, Defendant indicated, after he had been read his *Miranda* rights, that he understood each of his rights. *See Reynolds*, 2009 WL 776707, at *6; *see also United*

14

*States v. Ravensborg*, No. 13-CR-194 (MJD/LIB), 2013 WL 5565891, at *6 (D. Minn. Oct. 8, 2013) (finding the defendant knowingly and intelligently waived his *Miranda* rights where he indicated, via a head nod, that he understood his rights and proceeded to voluntarily answer questions). Defendant never asked Sergeant Moore to re-read any portion of the rights and never indicated he was confused. There is also no indication that Defendant was under the influence of drugs or alcohol or otherwise impaired such that he would have been unable to understand his rights. Moreover, Defendant talked openly and clearly for the duration of the interview, and though he began to cry at one point, the atmosphere was generally calm. *See United States v. Chopra*, No. 19-CR-305 (NEB/BRT), 2021 WL 347415, at *2 (D. Minn. Feb. 2, 2021) (finding that the defendant voluntarily waived his *Miranda* rights where the atmosphere was calm even though the defendant began crying during the interview and stated that he felt claustrophobic in the interview room). Under the totality of these circumstances, this Court finds that Defendant validly waived his *Miranda* rights and that his waiver was voluntary, knowing, and intelligent.

Accordingly, because Defendant waived his *Miranda* rights and his waiver was done voluntarily, knowingly, and intelligently, this Court recommends that Defendant's motion to suppress his statements during his January 8, 2020 interview should be denied.

## RECOMMENDATION

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence from Stop, Search and Seizure of Defendant and Vehicles (Doc. No. 83) be **DENIED**; and

2. Defendant's Motion to Suppress Statement (Doc. No. 84) be **DENIED**.

Date:  October 21, 2022

                                           *s/ Becky R. Thorson*
                                           BECKY R. THORSON
                                           United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **November 4, 2022**. A party may respond to those objections by **November 18, 2022**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.